746 August 10, 2017 No. 42

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Respondent on Review,*

*v.*

THOMAS ELDON EASTEP,
*Petitioner on Review.*

(CC 13CR0802; CA A155418; SC S064057)

On review from the Court of Appeals.*

Argued and submitted January 10, 2017.

Laura E. Coffin, Deputy Public Defender, Salem, argued the cause and filed the brief for petitioner on review. Also on the brief was Ernest G. Lannet, Chief Defender, Office of Public Defense Services.

Jeff J. Payne, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Balmer, Chief Justice, and Kistler, Walters, Landau, and Nakamoto, Justices. **

LANDAU, J.

The decision of the Court of Appeals is reversed. The conviction for unauthorized use of a vehicle is reversed. The remaining convictions are affirmed, but the sentences are vacated, and the case is remanded for resentencing.

_____
\* On appeal from Coos County Circuit Court, Richard L. Barron, Judge. 277 Or App 673, 371 P3d 1287 (2016)

\*\* Baldwin, J., retired March 31, 2017, and did not participate in the decision of this case. Brewer, J., retired June 30, 2017, and did not participate in the decision of this case. Flynn and Duncan, JJ., did not participate the consideration or decision of this case.

**LANDAU, J.**

*In this criminal case, defendant arranged to sell another person's truck for scrap. At* the time, the truck was in a significant state of disrepair. He was charged with, and ultimately convicted of, unauthorized use of a vehicle (UUV). ORS 164.135. At trial, he argued that the state had failed to prove that he had used another person's "vehicle," because the truck that he had arranged to sell was in a state of significant disrepair and was not currently operable. The trial court disagreed, and the Court of Appeals affirmed. *State v. Eastep*, 277 Or App 673, 371 P3d 1287 (2016). On review, defendant argues that, at least as used in the statute defining the offense of UUV, a "vehicle" must be capable of operation—which means either currently operable or operable with ordinary repairs—and there is no evidence that the truck was capable of operation. The state argues that the statute contains no requirement that a vehicle be currently operable or that it can become operable with ordinary repairs. In the state's view, a vehicle in need of significant repairs still may qualify as a "vehicle" under the UUV statute.

We agree with the state that the word "vehicle," as it is used in ORS 164.135(1)(a), includes no requirement of either current operability or capability of operation with only ordinary repairs. A vehicle may remain a "vehicle" within the meaning of that statute even if it needs more significant, but still reasonable, repairs. In this case, however, the state failed to establish that the truck that defendant had arranged to sell was in such a condition that it would have been reasonable to restore it to an operable condition. We therefore reverse defendant's conviction.

We review the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the state. *State v. Davis*, 360 Or 201, 205, 377 P3d 583 (2016). Stuart owned a pickup truck that was about 21 years old. The truck's "clutch had gone out," so she had it towed to a location between her property and a nearby boat ramp parking lot. Although the truck was not operable, Stuart used it to store expensive tools. The truck sat by the boat ramp parking lot for four or five months.

Defendant noticed that the truck had been sitting there for a few days. He did not know who owned it. Nevertheless, he called an automobile wrecking company to have it towed. He completed a form certifying that he had a possessory lien on the truck and that he had properly foreclosed on that lien. The company towed the truck and paid defendant $100.

Later that day, Stuart noticed that the truck was gone. She called the police to report it stolen. Police investigated and found that it had been towed away. The automobile wrecking company later returned the truck to Stuart.

Within a month after that, Stuart sold the truck for $321, with the sales price based on weight, to a scrap metal business, in an effort to "[t]o take whatever [she] could get for it." A mechanic working for the business was able to start and run the engine, but the engine and the clutch pedal were "seized," and the engine "was rattling so bad that [it] was no good." He also observed that the interior was torn up and "no good." The mechanic determined that the truck was "not capable of moving" under its own power because either the clutch or the transmission had seized up and that the truck was "no good," "not operable," and "strictly just scrap." The owner of the business planned to have it "scrapped out" by having it demolished after removing and saving a few windows.

Defendant was charged with UUV, for "exercis[ing] control over" the truck without Stuart's consent, ORS 164.135(1)(a). He was also charged with first-degree theft of the truck, second-degree theft of the $100 that he received from the automobile wrecking company, and false swearing. The case was tried to a jury. At the close of the state's case-in-chief, defendant moved for judgment of acquittal on the UUV count, arguing that the state was required to prove that the truck had been "operable" at the time that he exercised control over it. The trial court denied the motion. The jury found defendant guilty of UUV, second-degree theft, and false swearing, and the court entered a judgment of conviction and sentence on those counts.

Defendant appealed the judgment, assigning error to the trial court's denial of his motion for judgment of

acquittal on the UUV count. The Court of Appeals affirmed, reasoning that nothing in ORS 164.135(1)(a) required the state to prove that the vehicle had been "operable." *Eastep*, 277 Or App at 678.

On review, defendant argues that the UUV statute requires the state to prove that a "vehicle" is "capable of operation." According to defendant, "[a]n 'inoperable vehicle' in the context of UUV is an oxymoron." In his view, "[t]o be a vehicle, something must at least be capable of operating as a means of conveyance or transportation." Defendant acknowledges that a truck or automobile that is in need of ordinary maintenance or repair—for example, one that has a flat tire or an empty gas tank—qualifies as a "vehicle" within the meaning of ORS 164.135(1)(a). But he insists that the term excludes "a wrecked vehicle or an inoperable truck used for scrap." In this case, he argues, the evidence was that Stuart's truck was inoperable, was not capable of functioning as a means of transportation, and was valuable only as scrap. The state counters that, "regardless of whether a broken part or some other malfunction renders a vehicle inoperable, it is still a 'vehicle' for the purposes of the UUV statute," as long as it is capable of becoming operable, even with more than ordinary repairs.

Our task in construing the term "vehicle" in the UUV statute, ORS 164.135, is to determine the meaning that the legislature most likely intended, based on an examination of statutory text, other statutory context, legislative history, and applicable rules of construction. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). We begin with the text. ORS 164.135 provides:

"(1)   A person commits the crime of unauthorized use of a vehicle when:

"(a)   The person takes, operates, exercises control over, rides in or otherwise uses another's vehicle, boat or aircraft without consent of the owner;

"(b)   Having custody of a vehicle, boat or aircraft pursuant to an agreement between the person or another and the owner thereof whereby the person or another is to perform for compensation a specific service for the owner involving the maintenance, repair or use of such vehicle,

boat or aircraft, the person intentionally uses or operates it, without consent of the owner, for the person's own purpose in a manner constituting a gross deviation from the agreed purpose; or

"(c)   Having custody of a vehicle, boat or aircraft pursuant to an agreement with the owner thereof whereby such vehicle, boat or aircraft is to be returned to the owner at a specified time, the person knowingly retains or withholds possession thereof without consent of the owner for so lengthy a period beyond the specified time as to render such retention or possession a gross deviation from the agreement."

"(2)   Unauthorized use of a vehicle, boat or aircraft is a Class C felony."

The statute does not define the term "vehicle."[1] When statutes do not define their terms, we assume that the legislature intended them to have their plain, ordinary meanings. *State v. Dickerson*, 356 Or 822, 829, 345 P3d 447 (2015).

*Webster's* defines a "vehicle" as "**5** : a means of carrying or transporting something **:** CONVEYANCE: as **a :** a carrier of goods or passengers \*\*\* *specif* **:** MOTOR VEHICLE \*\*\* **b :** a container in which something is conveyed \*\*\* **c :** a piece of mechanized equipment \*\*\* **d :** a propulsive device." *Webster's Third New Int'l Dictionary* 2538 (unabridged ed 2002).[2] Other dictionaries supply similar definitions. *See, e.g., Funk & Wagnalls New Standard Dictionary of the English Language* 2637 (1963) (similarly, "[t]hat in or on which anything is or may be carried; \*\*\* conveyance").

---

[1]  The Oregon Vehicle Code currently defines the term "vehicle" as "any device in, upon or by which any person or property is or may be transported or drawn upon a public highway and includes vehicles that are propelled or powered by any means." ORS 801.590. That definition, however, post-dates enactment of the UUV statute, *see* Or Laws 1983, ch 338, § 109; it also is not cross-referenced in the UUV statute.

[2]  ORS 164.135(1)(a) was enacted in 1971, as we explain later in this opinion. *Webster's Third* was originally published in 1961. Although it has been republished in 1966, 1971, 1986, 1993, and 2002, the dictionary itself has not changed, except for minor corrections. Any new definitional material since 1961 appears in an addendum section at the beginning of each republication. *See generally* https://www.merriam-webster.com/about-us/ongoing-commitment (accessed Aug 2, 2017). As a result, any version of *Webster's Third*—regardless of its copyright date—provides a relevant source of ordinary meaning for statutes enacted any time after 1961, if not earlier.

Those definitions do suggest that a "vehicle" is defined in terms of its function, namely, transportation. But none explicitly requires that a means of transporting must be currently operable, or operable with ordinary repairs, to qualify as a "vehicle." That is consistent with common usage; it is not uncommon to refer to currently inoperable trucks or cars—regardless of the extent of disrepair—as "inoperable vehicles," for example. *See, e.g.*, Sanford A. Kaplan, *Westchester Opinion; When There is a Driving Hazard, Report It*, New York Times (Sept 13, 1987) ("The car itself had been badly battered, the windshield shattered. An air of desolation surrounded the inoperable vehicle.")[3]; Anthony C. Carpio, *Burbank Officials Discuss "More Aggressive" Code-Enforcement Policies to Catch Violators*, Los Angeles Times, June 16, 2017 ("The city could also consider cleanup campaigns * * * to remind residents to address any non-hazardous code violations on their property, such as inoperable vehicles and over-height weeds.").[4] In fact, nearly all states have statutes regarding "abandoned" or "junk" vehicles, which are no less "vehicles" merely because they are currently inoperable or in a significant state of disrepair. One of Oregon's highway beautification statutes, for example, refers to "junked, dismantled, wrecked, scrapped or ruined motor vehicles." ORS 377.605(5); *see also* Ariz Rev Stat § 28-4881 ("junk vehicle" defined as "a vehicle that is in such a state of deterioration that it cannot be profitably dismantled or salvaged for parts and cannot be profitably restored"); Wash Rev Code § 46.55.010(5) ("[j]unk vehicle" defined as one that is, among other things, "apparently inoperable").

In short, defendant is incorrect in asserting that the ordinary meaning of the term "vehicle" necessarily requires some element of operability—such as being capable of operation with ordinary repairs. To the contrary, the ordinary meaning of the term is, at least potentially, much broader than that. It remains to be seen whether the way in which the word is used in ORS 164.135 suggests a less expansive

---

[3] *See* http://www.nytimes.com/1987/09/13/nyregion/westchester-opinion-when-there-is-a-driving-hazard-report-it.html (accessed Aug 2, 2017).

[4] *See* http://www.latimes.com/socal/burbank-leader/news/tn-blr-me-code-enforcement-20170616-story.html (accessed Aug 2, 2017).

meaning of the term. *See State v. Cloutier*, 351 Or 68, 96, 261 P3d 1234 (2011) ("In construing statutes, we do not simply consult dictionaries and interpret words in a vacuum. Dictionaries, after all, do not tell us what words mean, only what words *can* mean, depending on their context and the particular manner in which they are used." (Emphasis in original.)).

The text of ORS 164.135 suggests a broader meaning of the term "vehicle" that is not limited to immediate operability or capable of operation with ordinary repairs. First, subsection (1)(a) of the statute provides that a person commits the offense of UUV when he or she "takes, operates, exercises control over, rides in or otherwise uses" another's vehicle (or boat or aircraft). Not all of those actions require that the vehicle be currently operable. It is possible, for instance, to "exercise[] control over" or "otherwise use[]" a vehicle regardless of whether it is currently in running condition. The statute thus suggests that the interest that is designed to be protected is not only the owner's ability to use a vehicle for transport, but for other purposes, as well. An owner of a recreational vehicle, for example, may reside in it. A person who sleeps in that vehicle without permission certainly may violate subsection (1)(a). And whether the vehicle is currently running would seem to be of no consequence.

Second, subsection (1)(b)—which refers to a vehicle taken in for, among other things, "maintenance" or "repair"—expressly contemplates that a "vehicle," within the meaning of that statute, is not necessarily one that is currently operable. Indeed, the subsection does not specify how much "maintenance" or "repair" such a vehicle may need.

Third, subsection (1)(c)—which refers to unlawfully retaining possession of a vehicle—likewise does not necessitate a currently running vehicle; the act of retaining or withholding possession could apply to a vehicle in virtually any condition.

To sum up, nothing in ORS 164.135 suggests that its reference to the term "vehicle" requires a currently operating car or truck or one that would be capable of operation with ordinary repairs. To the contrary, it expressly contemplates

that some amount of maintenance or repair may be required without transforming what was once a "vehicle" into something else. Moreover, the wording of ORS 164.135 indicates that it is intended to protect a vehicle owner's interest not just in using it for transportation purposes, but for other purposes that may not necessitate its current operability.

We also consider prior case law construing the provision at issue. *State v. McAnulty*, 356 Or 432, 441, 338 P3d 653 (2014). This court has had one occasion on which to interpret the term "vehicle" in ORS 164.135(1)(a), in *State v. Macomber*, 269 Or 58, 523 P2d 560 (1974). *Macomber* involved a UUV conviction under the same statute at issue in this case, based on evidence that the defendant had possessed multiple parts of a partially disassembled stolen truck. *Id.* at 59. On appeal, the state argued that there was evidence that the defendant had admitted that the truck was in running order when he first acquired it. *Id.* at 60. The court, however, concluded that the record contained no such admission; instead, the record showed only that he had acquired the truck "as a wreck and that he was rebuilding it." *Id.* at 61 n 2 (internal quotation marks omitted). The court concluded that the evidence constituted "at most an admission that the defendant obtained possession of a wrecked truck, which would not constitute a vehicle capable of operation." *Id.* Because there was no evidence that the defendant had used a vehicle "capable of operation," the court reversed the conviction. *Id.* at 62.

Of significance, the court in *Macomber* did not say that, to qualify as a "vehicle" under the UUV statute, the truck had to be in running order, only that it be "capable of operation," that is, not be completely disassembled or "wrecked." That suggests an allowance for some measure of repairs, at least up to a limit. In some cases, the cost of repairs will prove prohibitive, at which point the car or truck is a "wreck" and no longer a "vehicle" within the meaning of the statute.

Also relevant to our analysis of ORS 164.135 are prior versions of the statute, as well as its enactment history. Before 1971, three statutes criminalized activity that, for the most part, now generally falls within the UUV statute.

The first pre-1971 statute prohibited "tak[ing] or us[ing]" another's vehicle without authorization, but "without intent to steal it." *Former* ORS 164.670(1)(1969), *repealed by* Or Laws 1971, ch 743, § 432. This court characterized that earlier prohibition against "taking" another's car as a "joy-riding" statute. *State v. Eyle*, 236 Or 199, 201, 388 P2d 110 (1963). The court had no occasion to interpret what the statute meant by "using" another's car without permission. But, given that the statute referred to "tak[ing] or us[ing]" another's vehicle, it is likely that the legislature intended that "us[ing]" amounted to something other than taking— that is, joy-riding. And, as we have noted above, vehicles are routinely "us[ed]" for purposes other than driving, including for example, sleeping and storage. Those purposes do not necessarily require a currently operable vehicle or one that is capable of operation with ordinary repairs.

The second pre-1971 statute provided that anyone who, without the consent of the owner of a motor vehicle,

"climbs upon or into such motor vehicle, whether it is at rest or in motion; or, while it is at rest or unattended, attempts to manipulate any of the levers, the starting crank or other device, brakes or mechanism, or sets the vehicle in motion,"

would be subject to a sentence of up to six months imprisonment. *Former* ORS 164.650 (1969), *repealed by* Or Laws 1971, ch 743, § 432. That statute, which expressly applied whether the vehicle is at rest or in motion, likewise does not appear to have required that the vehicle be currently operable or capable of operation with ordinary repairs. For example, the statute appears to have prohibited releasing the brake of a car, regardless of whether it had an empty gas tank, or a dead battery, or a flat tire.

The third pre-1971 statute prohibited injury or interference with a motor vehicle without the owner's consent, *former* ORS 164.660 (1969), *repealed by* Or Laws 1971, ch 743, § 432. Specifically, the statute applied if a person

"wilfully breaks, injures, tampers with or removes any part of such [motor] vehicle for the purpose of injuring, defacing or destroying it, or temporarily or permanently preventing its useful operating for any purpose, or in any manner

wilfully or maliciously interferes with or prevents the running or operation of such motor vehicle."

At least the first set of described actions—breaking, injuring, tampering, or removing vehicle parts—could occur whether or not the motor vehicle currently was in running condition.

What is now ORS 164.135 was enacted as part of the 1971 Oregon Criminal Code, Or Laws 1971, ch 743, § 134. It was intended to incorporate the first two preexisting statutes and part of the third. As the commentary to the new Criminal Code explained, the new statute included

> "the kinds of acts covered by [*former*] ORS 164.670, the existing 'joy-riding' statute, as well as conduct such as manipulating, starting[,] or tampering with motor vehicles ([*former*] ORS 164. 650, [*former* ORS] 164.660)[, but] [d]amaging a vehicle would be covered by the sections on criminal mischief."

Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 134, 142 (July 1970). It is thus apparent that, in enacting the current UUV statute, the legislature intended to preserve existing prohibitions that could apply to vehicles that are not necessarily in current running condition.

Nothing in the record of the Criminal Law Revision Commission's deliberations suggests a contrary intention. A subcommittee of the commission addressed a proposed draft of what is now ORS 164.135, based on the Model Penal Code, § 223.9, and New York Revised Penal Law, § 165.05 (1965). Most of its discussion concerned the types of vehicles that would be included—specifically, whether the statute should be limited to "motor-propelled" vehicles or should embrace other vehicles such as gliders, sailboats, and bicycles. *See generally* Tape Recording, Criminal Law Revision Commission, Subcommittee No. 1, Apr 6, 1968, Tape 2, Side 2 (statements of committee members and Commission Project Director Paillette). Ultimately, the subcommittee agreed to include gliders and sailboats, but not bicycles, and so it agreed on wording that referred to a "vehicle, boat, or aircraft." *Id.*

The subcommittee also briefly discussed the prohibited conduct set out in the proposed draft, which included taking, operating, exercising control over, riding in, or otherwise using another's vehicle, boat, or aircraft. Project Director Paillette explained that the proposed legislation would broaden the conduct currently prohibited in the existing joy-riding statute. The subcommittee then discussed whether "entering" a vehicle without consent, also prohibited under then-existing law, would amount to unauthorized use. Members tentatively agreed that, to violate the UUV statute, a person would need to "exercise control," or otherwise start or somehow "use" the vehicle. Tape Recording, Criminal Law Revision Commission, Subcommittee No. 1, Apr 6, 1968, Tape 2, Side 2 (statements of Representative Elder, Paillette, and others); *see also* Tape Recording, Criminal Law Revision Commission, July 19, 1968, Tape 9, Side A (statement of Senator Burns, Chair of Subcommittee No. 1).

The full Commission later approved the subcommittee's revisions to the draft legislation, *see* Minutes, Criminal Law Revision Commission, May 14, 1970, 35 (approving section setting out new crime of UUV), and the legislature enacted them into law, Or Laws 1971, ch 743, § 134.

To recap, then, the ordinary meaning of the word "vehicle" is broad enough to include cars and trucks that may not currently be in operating condition, even if in need of extensive repairs. The use of the word in ORS 164.135 itself, as well as the predecessor statutes that it was intended to incorporate, also suggest that it is not limited to currently operating cars or trucks; in fact, some amount of needed maintenance or repair is expressly contemplated in ORS 164.135(1)(b). At the same time, this court's decision in *Macomber* holds that there is something of an outer limit to the condition of a car or truck if it is to be considered a "vehicle" within the meaning of the UUV statute, namely, that it not be in such a state of disrepair as to constitute a "wrecked" vehicle. 269 Or at 61 n 2. Implicit in the apparent reasoning of *Macomber* is the idea that the condition of a car or truck may be such that it is no longer reasonable to expend the time and resources that would be required to restore it to running condition.

It strikes us that determining the precise point at which it is no longer reasonable to invest in repairing a car or truck to maintain its condition as a "vehicle" necessarily will depend on the circumstances of the case, *viz.*, the nature of the disrepair, the amount of effort and expense required to make the car or truck operable, its original cost, its current value, its current uses, and so forth. In other words, whether the evidence shows that the condition of a given car or truck is such that it is beyond reasonable repair is a question for the trier of fact.

In that regard, we note that the issue is not one unique to Oregon law. In fact, the question whether a given vehicle is in such a state of disrepair so as to lose its character as a "vehicle" within the meaning of a statute is a common one that has been addressed in a large number of decisions. So far as we can determine, the consistent conclusion of courts in other jurisdictions addressing the issue is to treat it as one for the trier of fact. *See, e.g.*, *State v. Blevins*, 625 P2d 946, 948 (Ariz Ct App 1981) (whether a vehicle is so "demolished" or "dismantled" that it can no longer be considered a "vehicle" depends on facts of each case); *Parnell v. State*, 261 SE2d 481, 481-82 (Ga Ct App 1979) (evidence was sufficient to establish that defendant had stolen a motor "vehicle" even though the car "had no transmission or radiator"); *State v. Ridinger*, 266 SW2d 626, 632 (Mo 1954) (evidence was sufficient to establish that bus currently used as source of spare parts was a motor "vehicle"); *State v. Houston*, 1987 WL 30370 (1987) ("Ordinarily, the decision whether a partially dismantled vehicle remains a motor vehicle *** is a question of fact for the jury.").[5]

The remaining question for us is whether a rational factfinder could have found, from the evidence presented in this case, facts necessary to establish that defendant engaged

---

[5] Florida seems to be an exception. But that appears to be due to the fact that a Florida statute defines a vehicle as an "automobile, motorcycle, truck, trailer, *** or any other vehicle *operated* on the roads of this state." Fla Stat § 320.01(1)(a) (emphasis added). Under that statute, Florida courts have concluded that vehicles that are even temporarily inoperable are not considered "vehicles" for the purposes of that statute. *See, e.g.*, *Quanstrom v. Standard Guar. Ins. Co.*, 504 So 2d 1295, 1297 (Fla Dist Ct App 5th Dist 1987) (holding that car that had been inoperable for two months was not a motor vehicle).

in unauthorized use of a "vehicle" under ORS 164.135. *See State v. Clemente-Perez*, 357 Or 745, 762, 359 P3d 232 (2015) (in reviewing motion for judgment of acquittal, court determines whether state presented sufficient evidence from which rational trier of fact, drawing reasonable inferences, could find each element beyond reasonable doubt). We conclude that a rational jury could not have so found.

The undisputed evidence shows that Stuart's truck was about 21 years old. Its clutch had gone out, and it had been parked and not operated for four to five months. During all that time, and up until defendant took the truck, Stuart had not been using it for transport, although she had been using it to store tools. Shortly after defendant's arrest, in an effort "[t]o take whatever I could get for it," Stuart sold the truck to a scrap metal business for $321, based on its weight. The owner of the scrap metal business testified that the truck was not operable, "not capable of moving," and not going anywhere under its own power; and that he planned to have it "scrapped out." Although the engine turned over and ran, it "seized up" to the point where, once loose, "it was rattling so bad that the engine was no good." The clutch pedal also was "seized" and "no good," the clutch itself or the transmission was "seized up," and the interior also was "no good." The mechanic had determined almost immediately after starting the truck that it was "scrap"; the owner similarly had concluded that the truck was "strictly just scrap" and that, after removing and saving a few windows, he would have it demolished.

None of those facts permitted a rational jury to infer or otherwise determine the truck was in such a condition that it was reasonable to invest in repairing it to restore it to running condition. It follows that the state presented insufficient evidence to prove that defendant had exercised control, without the owner's consent, over a "vehicle" under the UUV statute, ORS 164.135(1)(a). The trial court therefore erred when it denied defendant's motion for judgment of acquittal. *See generally State v. Link*, 346 Or 187, 204-12, 208 P3d 936 (2009) (after construing disputed element in aggravated felony murder statute, court concluded that state presented insufficient evidence to satisfy that element

under its construction and, therefore, trial court erred in denying motion for judgment of acquittal). Accordingly, we reverse the judgment of conviction in part and remand to the trial court, so that it can enter a new judgment that does not include a guilty verdict on the UUV count and that resentences defendant accordingly.

The decision of the Court of Appeals is reversed. The conviction for unauthorized use of a vehicle is reversed. The remaining convictions are affirmed, but the sentences are vacated, and the case is remanded for resentencing.