No. 19 April 23, 2026 157

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Respondent on Review,*

*v.*

CRAIG ABE ALAN McCARTHY,
aka Craig McCarthy, aka Craig Abe Alen McCarthy,
aka Craig Abe Aln McCarthy,
*Petitioner on Review.*
(CC 20CR35674, 20CR49451, 20CR61735, 20CR53577)
(CA A178739 (Control), A178470, A178741, A178742)
(SC S071140)

En Banc

On review from the Court of Appeals.*

Argued and submitted April 23, 2025, at Eastern Oregon University, La Grande, Oregon.

Joshua B. Crowther, Deputy Public Defender, Oregon Public Defense Commission, Salem, argued the cause and filed the brief for petitioner on review. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section.

Peenesh Shah, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. Also on the brief were Dan Rayfield, Attorney General, and Benjamin Gutman, Solicitor General.

GARRETT, J.

The decision of the Court of Appeals is affirmed. The cases are remanded to the circuit court for further proceedings consistent with the Court of Appeals' decision.

_____
* Appeal from Clackamas County Circuit Court, Heather Karabeika, Judge. 332 Or App 447 (2024) (nonprecedential memorandum opinion).

**GARRETT, J.**

This case requires us to decide whether a trailer is a "vehicle" for purposes of ORS 164.135, which defines the offense of unauthorized use of a vehicle (UUV). Defendant was charged with two counts of UUV based on evidence that he knowingly took two utility trailers without the consent of either owner. At trial, defendant moved for judgment of acquittal, arguing that a trailer is not a "vehicle" within the meaning of the statute. The trial court denied the motion and convicted defendant on both counts. The Court of Appeals affirmed that ruling.

On review, defendant urges us to hold that a "vehicle" under the statute refers to "driver-operated and self-propelled vehicles." Defendant further argues that the statute should be interpreted in light of its historical purpose, which, defendant contends, was to prevent "joyriding." The state responds that the definition of "vehicle" is broad enough to cover trailers, and it points to legislative history showing an intent to do so. As explained below, we conclude that the legislature intended for ORS 164.135 to apply to trailers. Accordingly, we affirm the decision of the Court of Appeals.[1]

## I.  BACKGROUND

Because this case reaches us in the posture of defendant's appeal from the trial court's denial of his motion for judgment of acquittal, we state the facts in the light most favorable to the state. *State v. Sierra*, 349 Or 506, 508, 254 P3d 149 (2010), *adh'd to as modified on recons*, 349 Or 604, 247 P3d 759 (2011).

The charges in this case arise from two separate incidents in which defendant took a utility trailer that did not belong to him, without the consent of either owner. Based on those incidents, the state charged defendant with two counts of unauthorized use of a vehicle under ORS 164.135(1)(a). For each count, the state alleged that defendant had

---

[1] In the consolidated appeal, defendant had appealed from judgments of conviction in four trial court cases. The Court of Appeals reversed and remanded two convictions in one of the underlying cases, remanded for resentencing, and otherwise affirmed. Our decision here does not affect that disposition.

unlawfully and knowingly taken a "vehicle," *i.e.*, a utility trailer, without the owner's consent.[2]

Defendant moved for a judgment of acquittal on both counts, arguing that a utility trailer is not a "vehicle" for purposes of ORS 164.135. Defendant argued that "vehicle" under the statute means "motor vehicle" or, at minimum, a "propulsive device," and, therefore, the two utility trailers did not qualify as "vehicles." In response, the state relied on a Court of Appeals case holding that a trailer is a "vehicle" for purposes of that statute. *State v. Phillips*, 315 Or App 178, 187, 501 P3d 537 (2021). Based on the stipulated facts and applicable case law, including *Phillips*, the trial court denied defendant's motion for judgment of acquittal and found him guilty on both counts of UUV.

On appeal, defendant argued that the legislature did not intend "vehicle" to include a utility trailer, and that *Phillips* had been wrongly decided. Defendant argued that "vehicle" should be interpreted within the historical context that gave rise to ORS 164.135 and its predecessors, which, according to defendant, was the advent of the automobile and, with it, the phenomenon of "joyriding." The Court of Appeals rejected that argument and affirmed defendant's UUV convictions. In doing so, the court relied on its construction of the statute in *Phillips* and declined defendant's request to overrule that case. We allowed defendant's petition for review.

## II.   ANALYSIS

ORS 164.135(1)(a)(A) provides, in relevant part, that a person commits the crime of unauthorized use of a vehicle when the person "knowingly takes, operates, exercises control over or otherwise uses another's vehicle, boat or aircraft[.]" Although the statute contains several elements, the only one at issue in this case is whether the objects

---

[2] The stipulated facts describe the two items as "a black utility trailer" and a "4x8 utility trailer," respectively. The indictments refer to a "trailer" in both counts. Whether there is a distinction between "trailer" and "utility trailer" appears immaterial under either party's theory of the case. Defendant makes no argument that the statute might apply to some types of trailers but not others. Both the trial court and the Court of Appeals appear to have used "trailer" and "utility trailer" interchangeably, as do we.

that defendant knowingly took—trailers—are "vehicles." Defendant argues that "vehicle" should be understood to mean "self-propelling and driver-operated property capable of transporting goods or people on the highway." Applying that definition, defendant contends that a trailer is not a "vehicle." The state, in contrast, argues that "vehicle" refers to "something designed or primarily used for transporting people or goods in a manner involving mechanical operation on public roads," a definition that captures trailers.

The parties' dispute regarding the meaning of "vehicle" in ORS 164.135 is a matter of statutory interpretation, which we resolve by considering the text of the statute in context, as well as any helpful legislative history. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). This court has construed ORS 164.135 in two previous cases—*State v. Macomber*, 269 Or 58, 523 P2d 560 (1974), and *State v. Eastep*, 361 Or 746, 399 P3d 979 (2017)—which, together, provide detailed analysis of the text and context of the statute. Nonetheless, for reasons explained below, that analysis is of little help in resolving whether a trailer is a vehicle. As will be explained, this case ultimately turns more on legislative history, which specifically addresses the question on review. And, as indicated above, we conclude that the legislature intended for ORS 164.135 to apply to trailers.

A.   *Text and Context*

As noted, ORS 164.135(1) provides, in relevant part:

"A person commits the crime of unauthorized use of a vehicle when:

"(a)(A)   The person knowingly takes, operates, exercises control over or otherwise uses another's vehicle, boat or aircraft[.]"

The statute does not define "vehicle," so, in the absence of indicators to the contrary, we assume that the legislature intended to give the term its "plain, natural, and ordinary meaning." *State v. Eggers*, 372 Or 789, 798, 558 P3d 830 (2024) (internal quotation marks omitted). Accordingly, as we often do, we "turn to dictionaries as a starting point in our analysis because they provide a range of possible meanings that a given word could reasonably have." *Id.* at 746.

Consistent with that methodology, in this court's previous analysis of ORS 164.135, we noted the following definition of "vehicle":

> "**5 :** a means of carrying or transporting something **:** CONVEYANCE: as **a :** a carrier of goods or passengers *** *specif* **:** MOTOR VEHICLE *** **b :** a container in which something is conveyed *** **c :** a piece of mechanized equipment *** **d :** a propulsive device.

*Eastep*, 361 Or at 751 (quoting *Webster's Third New Int'l Dictionary* 2538 (unabridged ed 2002)). We explained that dictionary definitions suggested that a "vehicle" is "defined in terms of its function, namely, transportation." *Id.* at 752. On that, the parties agree. Both parties incorporate transportation of people or goods in their respective definitions. The parties also agree, however, that the ordinary, dictionary definitions do not resolve the issue before us. Defendant argues that dictionary definitions are inconclusive because they could lead to absurd results, such as criminal charges for the unlawful use of a shopping cart or a wheelbarrow, both of which are vehicles under the broad dictionary definitions. The state agrees that the dictionary definitions are inconclusive, noting that the dictionary definitions could apply equally to the overly broad examples cited by defendant and to what the state views as defendant's overly narrow definition.

The parties also agree that the triad in which the term "vehicle" appears throughout the statute—"vehicle, boat or aircraft"—offers some insight into the legislature's intent. Both parties invoke the principle of *noscitur a sociis*, "an old maxim which summarizes the rule both of language and of law that the meaning of words may be indicated or controlled by those with which they are associated." *State v. Walker*, 356 Or 4, 15 n 5, 333 P3d 316 (2014) (internal quotation marks omitted). Applying that maxim to "vehicle, boat or aircraft," defendant contends that what unites the three is that they are all "self-propelled transportation devices" and "distinct from the property items that [they] might tow or pull." The state, applying the same maxim, argues that what unites the three is something more general: They are all designed to transport goods and people. The state

counters defendant's argument by pointing out that many boats and some aircraft, including gliders, are not self-propelled, and that the legislative history indicates that the legislature intended to include some of those vehicles.

The verbs in the statute also inform the context in which the legislature used the term "vehicle." As noted above, the crime of UUV requires that a person knowingly "takes, operates, exercises control over or otherwise uses another's vehicle, boat or aircraft." The range of verbs indicates that the statute can be violated by a person who uses but neither takes, operates, nor rides in the vehicle. Similarly, a person can "take" or "exercise control over" a vehicle in violation of the statute, neither of which would seem to require that the vehicle be self-propelled or driver-operated. The range of verbs, therefore, suggests that the statute covers more than "joyriding." And, as this court has previously recognized, by its use of verbs the statute "suggests that the interest that is designed to be protected is not only the owner's ability to use a vehicle for transport, but for other purposes, as well." *Eastep*, 361 Or at 753, 755 (citing sleeping and storage as examples of "other purposes"). In short, both defendant and the state propose plausible interpretations of the text and context, although the legislature's choice of wording suggests a purpose broader than to prohibit "joyriding," as defendant urges.

We first construed ORS 164.135 in *Macomber*, 269 Or at 60, concluding that the statute is "broad enough to include situations in which the exercise of control over an operable vehicle consists of something less than the operation of the vehicle." The defendant in that case had possessed numerous parts of a partially disassembled stolen truck. *Id.* at 59. On those facts, we noted that the defendant had possessed at most "a wrecked truck, which would not constitute a vehicle capable of operation." *Id.* at 61 n 2. *Macomber*, therefore,—in concluding that ORS 164.135 does not require "operation of the vehicle"—established an outer limit at which an otherwise operable vehicle is so disassembled or in such a state of disrepair that it ceases to be "operable" and, therefore, no longer qualifies as a vehicle under the statute.

In *Eastep*, this court again considered whether the statute applied to a truck in significant disrepair. 361 Or at 748, 750. The truck did not run, and the owner had used it primarily for storage. *Id.* at 748. After it was returned to her, the owner sold it for scrap. *Id.* The mechanic who examined the truck concluded that it was "not capable of moving under its own power," "not operable," and "strictly just scrap." *Id.* at 749 (internal quotation marks omitted). On those facts, the defendant argued that, under *Macomber*, the truck was not a vehicle. We agreed. In doing so, we explained that a "vehicle" need not "currently be in operating condition" and, under the express terms of the statute, may require "maintenance" or "repairs."[3] *Id.* at 757. A truck that requires "reasonable repairs" to be made operable is, we concluded, still a "vehicle." *Id.* at 757. In contrast, a "wrecked" truck—one that could not be put in operating condition even with reasonable repairs, as was the case in *Macomber*—did not qualify as a "vehicle." *Id.* Whether a vehicle falls on one side of that line or another, we explained, is generally "a question for the trier of fact." *Id.* at 758. On the facts of that case, however, we concluded that a rational factfinder could not have found that the truck could be put in operable condition even with reasonable repairs. *Id.* at 759.

Neither *Macomber* nor *Eastep* is of much assistance in resolving whether a trailer is a vehicle. They establish that an otherwise operable vehicle may be so disassembled or be in such a state of disrepair that, even with reasonable repairs, it no longer qualifies as a vehicle under the statute. But those cases both involved a truck, which undisputedly

---

[3] The current version of ORS 164.135(1)(c) provides:

"(1) A person commits the crime of unauthorized use of a vehicle when:

"* * * * *

"(c) Having custody of a vehicle, boat or aircraft pursuant to an agreement between the person or another and the owner thereof whereby the person or another is to perform for compensation a specific service for the owner involving the *maintenance*, *repair* or use of such vehicle, boat or aircraft, the person intentionally uses or operates it, without consent of the owner, for the person's own purpose in a manner constituting a gross deviation from the agreed purpose[.]"

(Emphases added.). Thus, the statute presumes that a "vehicle" may be in a condition of temporary inoperability.

*would* have been a vehicle if operable, and therefore do not help us understand the scope of the term.

Defendant nonetheless relies on *Eastep*, arguing that the truck in that case—because it was "just scrap," used as storage, not capable of moving under its own power, but capable of being towed—was effectively a trailer. Defendant's argument, however, does not take into account that operating a trailer differs from operating a truck. A truck that is incapable of moving under its own power, must be towed, and requires extensive repairs may be inoperable—"strictly just scrap," as the mechanic in *Eastep* described it—and, therefore, not a "vehicle" for purposes of ORS 164.135. But, given the different purposes and functions of a trailer, it does not follow that an inoperable truck that must be towed and cannot be made operable with reasonable repairs is the same thing as a trailer. Nor does it follow that a trailer that is incapable of moving under its own power and must be towed is "inoperable." Such a truck may be "strictly just scrap"; the trailer, however, remains operable. Indeed, that is precisely how people use trailers.[4]

As additional context, the state argues that other paragraphs of the statute support its argument that the legislature did not intend "vehicle" to require self-propulsion. In *Eastep*, this court drew support for its conclusion that ORS 164.135 does not require a "vehicle" to be currently operable from two paragraphs of the statute, which have since been renumbered but otherwise remain the same.[5] ORS 164.135(1)(c) makes it a crime to use or operate a vehicle entrusted to a person for maintenance or repairs in gross deviation of the service agreement. ORS 164.135(1)(d) makes it a crime to retain or withhold a vehicle entrusted to a person after the specified return date in gross deviation of the agreement. This court explained that neither of those paragraphs required the vehicle to be currently operable. *Id.* at

---

[4] The dictionary defines "trailer," as relevant here, as "**3:** a vehicle or one in a succession of vehicles hauled usu. by some other vehicle: as *** **c:** a nonautomotive highway or industrial-plant vehicle designed to be hauled (as by a tractor, motort ruck [*sic*], or passenger vehicle." *Webster's* at 2424.

[5] In 2019, the legislature amended ORS 164.135, adding paragraph (1)(b) and therefore moving the remaining two paragraphs to (1)(c) and (1)(d) respectively. Or. Laws 2019, ch 530, § 1.

753-4. Based on that observation, the state concludes that, if the statute does not require current operability, it cannot require the capacity for self-propulsion. But, as this court recognized in *Eastep*, a vehicle that is not currently operable may still have the *capacity* for self-propulsion and may, with reasonable repairs, be put back in operable condition. *Id.* at 757. *Eastep*, therefore, undercuts the state's argument that the capacity for self-propulsion is not required.

Finally, the state argues that related statutes further support its argument that, for the purposes of ORS 164.135, a "vehicle" need not be driver-operated or self-propelled. *Former* ORS 482.030(4) (1969), *repealed by* Or Laws 1983, ch 338, § 978 defined vehicle as "every device in, upon or by which any person or property is or may be transported or drawn upon a public highway, except devices moved by human power or used exclusively upon stationary rails or tracks." *Former* ORS 486.011(11) (1969), *repealed by* Or Laws 1983, ch 338, § 978 provided, "'Vehicle' means every trailer or semitrailer, and every device which is self-propelled or propelled by electric power from overhead trolley wires, but not operated upon rails."[6] Two of the three statutes that were the precursors of ORS 164.135—*former* ORS 164.650 and *former* ORS 164.660 but not *former* ORS 164.670, all three *repealed by* Or Laws 1971, ch 743, § 432—incorporated by reference definitions from the Motor Vehicle Code. In drafting ORS 164.135, however, the subcommittee chose not to incorporate any of those definitions. As the subcommittee explained, it wanted to avoid the possibility that a change in the Motor Vehicle Code could alter the Criminal Code. Tape Recording, Criminal Law Revision Commission, Subcommittee No. 1, Apr 6, 1968, Tape 11, Side 1. Under those circumstances, the definitions in existing law cannot bear much weight.

Defendant, by contrast, urges us to interpret the statute in light of its historical context, which he characterizes as the development of cars and "joyriding." The problem is that, even if defendant were correct about that original

---

[6] *Former* ORS 482.030 (1969) was included in the chapter on "Operators' and Chauffeurs' Licenses." *Former* ORS 486.011 (1969) was included in the chapter on "Financial Responsibility Law."

purpose, the scope of the statute has expanded. The original 1911 law—a predecessor to ORS 164.135(1)(a)—applied to "[e]very person who takes or uses without authority any vehicle without intent to steal." Or Laws 1911, ch 174 § 24. Current ORS 164.135(1)(a) applies when a "person knowingly takes, operates, exercises control over or otherwise uses another's vehicle, boat or aircraft[.]" Thus, the current statute expressly covers more property and more conduct than the original version. And, as the state points out, not all boats and aircraft are self-propelled.

In sum, the dictionary definitions of "vehicle" and the verbs in the statute suggest, as we emphasized in *Eastep*, that the legislature was mindful of the variety of ways that people use vehicles, including for sleeping and storage. Defendant's argument that the statute was intended only to cover joyriding is difficult to square with the text, which, as noted, provides that a person can violate the statute by "using" the vehicle without taking, operating, or riding in it.

B.   *Legislative History*

ORS 164.135 was enacted in 1971 as part of the complete revision of the Oregon Criminal Code. Or Laws 1971, ch 743 § 134; *see also Eastep*, 361 Or at 756. In 1967, the legislature created the Oregon Criminal Law Revision Commission—a body consisting of legislators and nonlegislators—to revise the criminal laws of the state. *See State v. Garcia*, 288 Or 413, 416, 605 P2d 671 (1980) (describing the history of the commission). The commission based much of its project on the Model Penal Code (MPC), developed by the American Law Institute. Proposed Oregon Criminal Code, Final Draft and Report, Foreword, XXII (July 1970). As defendant emphasizes, the MPC version of the UUV statute expressly limited its application to "motor-propelled vehicles." The subcommittee charged with drafting the statutes on theft and related offenses was chaired by Senator John D. Burns and included Project Director Don Paillette as a member. In drafting the UUV statute, the subcommittee was consolidating three existing statutes—*former* ORS 164.670, *former* ORS 164.650, and part of *former* ORS164.660. *See Eastep*, 361 Or at 754-56. In its first preliminary draft, the subcommittee initially followed the MPC version of UUV.

As Director Paillette explained in presenting his first preliminary draft to the subcommittee, he had expressly limited the draft to "motor-propelled vehicles" because, in his view, that was the type of property that the statute was designed to protect. Tape Recording, Criminal Law Revision Commission, Subcommittee No. 1, Apr 6, 1968, Tape 11, Side 1. Paillette noted, though, that the draft's limitation to "motor-propelled vehicles" departed from the existing statute, *former* ORS 164.670, which covered "any vehicle, watercraft or aircraft"[7] and, he explained, could be interpreted broadly to include "other types of property, other than motor vehicles." *Id.* On the other hand, he cited a 1963 decision by this court, which had characterized a previous version of the statute as "the 'joy-riding' statute" and described it as "'designed to condemn the acts of a person who takes another's automobile without permission[.]'" *Id.* (quoting *State v. Eyle*, 236 Or 199, 201, 388 P2d 110 (1963)).

In that meeting, however, the subcommittee decided to remove "motor-propelled" from the draft statute and to replace it with the phrase "vehicle, boat or aircraft," closely tracking the existing statute. Tape Recording, Criminal Law Revision Commission, Subcommittee No. 1, Apr 6, 1968, Tape 12, Side 1; *see also* Minutes, Criminal Law Revision Commission, Subcommittee No. 1, Apr 6, 1968, 14 ("It was then moved that the preliminary draft on unauthorized use of a vehicle be approved as amended and this motion also carried without opposition."). Thus, to the extent that the first preliminary draft relied on *Eyle*'s characterization of a previous version of the statute as "the 'joy-riding' statute," the subcommittee rejected that proposal and broadened the scope of the statute. The next draft—Preliminary Draft No. 2—incorporated those changes and included the commentary that, with minor modifications, was later presented to the legislature with the commission's final draft. In that commentary, the subcommittee explained, "The first draft of the section limited its coverage to 'motor-propelled' vehicles only; however, the subcommittee felt that the proposal should protect owners of such things as *trailers*, sailboats

---

[7] In 1965, the legislature amended *former* ORS 164.670, broadening the statute from "any vehicle" in *former* ORS 164.670 (1963) to "any vehicle, watercraft or aircraft." Or. Laws 1965, ch 552, § 1.

and gliders." Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Preliminary Draft No. 2, 3 (Apr 1968) (emphasis added).

When Senator Burns presented the subcommittee's Preliminary Draft No. 2 to the full commission, he referred the commissioners to the minutes of the subcommittee's meeting on April 6, 1968. Tape Recording, Criminal Law Revision Commission, July 19, 1968, Tape 9, Side 1. The commission unanimously approved the draft for circulation. *Id.*; *see also* Minutes, Criminal Law Revision Commission, July 19, 1968, 2-3. The full commission later approved the circulated draft of the statute, *see* Minutes, Criminal Law Revision Commission, May 14, 1970, 35, and the legislature enacted it into law, Or. Laws 1971, ch 743, § 134. *See also Eastep*, 361 Or at 757.

Pointing out that the audio recording of the subcommittee meeting on April 6, 1968, makes no mention of trailers, defendant argues that the commentary therefore conflicts with the subcommittee hearing and that we should "give greater weight to the actual hearing." The state counters that the commentary does not conflict with the subcommittee hearing and that, even if it did, more weight should be given to the commentary. For several reasons, we agree with the state.

First, this court has repeatedly relied on the commentary as authoritative legislative history for the 1971 revisions to the Criminal Code. *See, e.g.*, *State v. Williams*, 374 Or 648, 582 P3d 637 (2025) (relying on the "official" commentary to construe ORS 164.395); *State v. Wallace*, 373 Or 122, 561 P3d 602 (2024) (relying on the commentary to construe ORS 163.305(3) and ORS 163.315(1)(b)); *State ex rel Turner v. Frankel*, 322 Or 363, 908 P2d 293 (1995) (relying on the commentary to construe ORS 131.525(1)(b)(D)). As we recently reiterated, we "generally assume[] in the absence of other legislative history that the Legislative Assembly accepted the commission's explanations." *Williams*, 374 Or at 672 (internal quotation marks omitted). To be sure, we have also said that, when appropriate, we will rely on the "discussions that preceded the adoption of the final draft" as relevant legislative history. *State v. Carpenter*, 365 Or 488, 497

n 4, 446 P3d 1273 (2019). But we must not lose sight of the fact that it was the written commentary, and not the earlier subcommittee deliberations, that the legislature received as the official record and recommendations of the commission. We will not assume that the legislature was aware of, much less intended to incorporate, subcommittee discussions that may be inconsistent with or not reflected in the final commentary that the commission presented. *Cf., e.g.*, *Kohring v. Ballard*, 355 Or 297, 311-12, 325 P3d 717 (2014) (evaluating statements of nonlegislators and explaining that in some cases "it is appropriate to give greater weight to such legislative history, as when the nonlegislators were the drafters and principal proponents of a bill, *and it is clear that the legislature relied on their explanations*." (Emphasis added.)).[8]

For similar reasons, we are not persuaded by defendant's argument that the commentary's reference is "vague" and "unhelpful" because the commentary does not further describe what it meant by "trailer." The question before this court is whether the legislature intended to include "trailers" within the meaning of "vehicles" for purposes of ORS 164.135. In resolving that question, the fact that the commentary specifically describes an intent to include "trailers" is far more meaningful than any failure to distinguish among different types of trailers.

Second, even if we were inclined to place equal weight on the subcommittee discussions as on what is reflected in the commission's final work product, we are not persuaded by defendant's arguments regarding those discussions. Defendant contends that the commentary's inclusion of "trailers" is not supported by the audio record

---

[8] Defendant cites authorities expressing a preference for audio recordings over "minutes," but those statements have been made regarding legislative committee hearings. *Wright v. Turner*, 354 Or 815, 823 n 5, 322 P3d 476 (2014) ("Because no audio recording is available, we quote from the minutes."); *Vector Marketing Corp. v. Employment Dept.*, 275 Or App 999, 1008 n 6, 365 P3d 686 (2015); Jack Landau, *Oregon Statutory Construction*, 97 Or L Rev 583, 700 (2019) ("The best evidence of what transpired in a committee hearing is the audio recording."). This case does not involve legislative committee hearings; it concerns the actions of the commission, for which the written commentary is the official record. In addition, nothing indicates that the legislature was made aware of—much less relied on—the subcommittee's internal deliberations preceding the published commentary.

of the subcommittee hearing. Defendant is correct that the subcommittee discussed sailboats and gliders, but did not mention trailers. That incongruity does not, however, support defendant's argument that the subcommittee removed "motor-propelled" from the definition of vehicle "only to make it obvious that the statute would cover non-motorized vehicles that *could be operated and driven*, such as, sailboats and gliders[.]" (Emphasis in original.) As noted, Director Paillette initially took the position that the statute should be limited to "motor-propelled" vehicles and that there was not a compelling reason to include other types of vehicles, citing sailboats as an example. Tape Recording, Criminal Law Revision Commission, Subcommittee No. 1, Apr 6, 1968, Tape 11, Side 1. One member pointed out that, without "motor-propelled," "vehicle" could be interpreted to include a wheelbarrow. *Id.* Chairman Burns noted that removing "motor-propelled" could lead to "some squirrely cases," citing bicycles as an example. *Id.* Nonetheless, after much deliberation—which included discussion of automobiles, horsedrawn carriages, surreys, buckboards, yachts, rowboats, sailboats, bicycles, wheelbarrows, hot-air ballons, airplanes, and gliders—the subcommittee agreed to remove "motor-propelled" and replace it with "vehicle, boat or aircraft." It is not possible to discern from that discussion any clear intention to include only "non-motorized vehicles that could be operated and driven," as defendant contends.

Nor does the subcommittee discussion otherwise reflect any clear intention to *exclude* trailers. Indeed, of the myriad devices discussed, the subcommittee expressed a clear intent only as to some of them. Motor-propelled vehicles, sailboats, bnd gliders were clearly included. Buckboards, surreys, and horse-drawn carriages were clearly excluded. Bicycles proved more difficult; although the subcommittee appeared skeptical of including them, it did not express a clear intention one way or the other. Trailers, as noted, were not mentioned at all. Therefore, the extent to which the commentary's express inclusion of trailers does or does not conflict with the subcommittee discussion depends on the strength of the comparisons that may be drawn between trailers and those devices that the subcommittee clearly intended either to include or exclude. Defendant suggests

that trailers are analogous to horse-drawn carriages and, thus, the commentary conflicts with the subcommittee hearing. The state counters that trailers are analogous to gliders and, thus, there is no conflict. In all events, this is not a case where the commentary clearly says one thing and the record of the subcommittee proceeding clearly says the opposite. Rather, the commentary expressly includes trailers, and the subcommittee deliberations were, at best, inconclusive. And it is the commentary that was before the legislature when the statute was passed.

For the foregoing reasons, based on the text, context, and legislative history, we conclude that the legislature intended "vehicle" to include trailers for the purposes of ORS 164.135.

The decision of the Court of Appeals is affirmed. The cases are remanded to the circuit court for further proceedings consistent with the Court of Appeals' decision.